IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WEST VIRGINIA UNIVERSITY
HOSPITALS, INC.,

       **Plaintiff,**

       **v.**

**EDWARD G. RENDELL, Governor**
**of the Commonwealth of Pennsylvania,**
**et al.,**

       **Defendants.**

: 
:
:
:
: **Civil No. 1: CV-09-1684**
:
:
:
: **JUDGE SYLVIA H. RAMBO**
:
:
:

# M E M O R A N D U M

      The present case is the continuation of a dispute between the parties over whether Plaintiff West Virginia University Hospitals, Inc. ("WVUH") is entitled to trauma disproportionate share hospital ("Trauma DSH") payments under the Pennsylvania Trauma Systems Stabilization Act, 35 Pa. Cons. Stat. Ann. § 6943.1 *et seq.* ("Trauma Act"). Defendants are certain Pennsylvania state officials—Edward G. Rendell, Governor of the Commonwealth of Pennsylvania; Estelle B. Richman, Secretary of the Department of Public Welfare; and Michael Nardone, Deputy Secretary for Medical Assistance Programs (collectively referred to as "the Commonwealth" or "DPW"). The dispute between these parties has a long and winding procedural history involving two previous cases before this court: *W. Va. Univ. Hosps., Inc. v. Casey,* No. 1:86-cv-0955, slip. op. (M.D. Pa. Oct. 18, 1990) ("*WVUH I*") and *W. Va. Univ. Hosps., Inc. v. Rendell*, No. 1:06-cv-0082, slip. op. (M.D. Pa. Nov. 5, 2007) ("*WVUH II*"). Although the instant dispute is only

generally related to *WVUH I*,[1] it arose directly from *WVUH II*, a case decided only two years ago. The current case concerns the Commonwealth's decision to require WVUH to be accredited by the Pennsylvania Trauma Systems Foundation ("PTSF" or "the Foundation") as a prerequisite for receiving Trauma DSH payments for fiscal year 2008-2009. In its view, this requirement neither runs afoul of the court's decision in *WVUH II* nor the Constitution. Conversely, Plaintiffs believe that it runs afoul of both.

In effect, the current dispute is the one that went undecided by the court in its November 5, 2007 memorandum and order. In that memorandum, the court stated that "because an out-of-state hospital that would otherwise meet the criteria for a Level I trauma center cannot be certified as such by [PTSF], it cannot receive Trauma DSH payments from Pennsylvania." (1:06-cv-0082, Doc. 55 at 5.) The court noted in a footnote that "WVUH asserts that it has been certified as a Level I trauma center by West Virginia based on criteria approved by [the American College of Surgeons] . . .[and] that it meets or exceeds all criteria required for certification as a Level I trauma center in Pennsylvania apart from in-state residency. . . . Defendants claim that they lack information to verify these claims. . . ." (*Id.*, n. 3.) The court demurred deciding whether WVUH met or exceeded PTSF's accreditation standards because Defendants in *WVUH II* admitted that they were treating WVUH

---

[1]The current dispute between the parties involves Trauma DSH payments made pursuant to the Trauma Act. This class of payments did not exist at the time the court decided *WVUH I*. Instead, *WVUH I* involved the Commonwealth's paying lower Medicaid reimbursement rates for acute care general hospital services to out-of-state hospitals treating Pennsylvania Medicaid patients than it paid to in-state-hospitals. The court found that this scheme was unconstitutional and required Defendants to "treat WVUH as an in-state hospital for purposes of determining Pennsylvania's medical assistance reimbursement for acute care general hospital services," and that "Medicaid payments to WVUH shall include such increased rates as may be paid to in-state hospitals." *WVUH I*, slip op. ¶¶ 1, 3.

differently solely because it is located outside the borders of Pennsylvania. *Id.* Here, however, whether WVUH's West Virginia and American College of Surgeons ("ACS") accreditations meet or exceed PTSF's accreditation is the core of the dispute in this case.

Pending is Plaintiff's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. (Doc. 5.) Plaintiff seeks to enjoin the Commonwealth from paying Trauma DSH payments to any Pennsylvania hospital until a state plan amendment and any necessary statutory provisions have been submitted to and approved by this court. Plaintiff also seeks to enjoin the Commonwealth from requiring WVUH to obtain accreditation from the Foundation as a condition of receiving Trauma DSH payments. This motion was originally filed under the docket for *WVUH II*, 1:06-cv-0082, and a temporary restraining order was entered by consent of the Commonwealth under that number (1:06-cv-0082, Doc. 106.) On August 13, 2009, the court held a hearing on WVUH's motion for preliminary injunction under the *WVUH II*'s docket number. On August 14, 2009, the court and the parties had a conference call to discuss procedurally how WVUH's motion should proceed. At the court's behest, the parties agreed that a new lawsuit would more appropriately address the issues raised by WVUH's motion for preliminary injunction, and agreed to a continuation of the temporary restraining order issued in 1:06-cv-0082 until October 12, 2009. (Doc. 3.) On August 28, 2009, WVUH filed the complaint in the captioned case. (Doc. 1.) That same day, WVUH filed its motion for preliminary injunction, (Doc. 5), and a stipulation between the parties, (Doc. 3), that the evidence presented at the August 13, 2009

3

hearing in 1:06-cv-0082 is admissible in this case.[2]  WVUH's motion is now ripe for disposition.

## I.       **Background**[3]

WVUH seeks a preliminary injunction barring Defendants from distributing Trauma DSH payments pending resolution of the instant case.  The current dispute between these parties is inextricably linked with the court's decision in *WVUH II*, and a more detailed analysis of the court's decision in that case is helpful to a resolution of Plaintiff's motion for preliminary injunction.

### A.     *WVUH II*

It comes as no surprise to the court that the parties disagree about the scope and effect of the court's decision in *WVUH II*.  Almost immediately after the court issued its decision, the parties took entrenched positions that continue to this day.  In *WVUH II*, Plaintiff brought its claims under 42 U.S.C. § 1983 and asserted that Defendants refusal to pay it Trauma DSH payments violated the Equal Protection clause of the Fourteenth Amendment of the United States Constitution, and the Commerce Clause of Article I, § 8 of the United States Constitution.[4]

---

[2]On September 4, 2009, the court issued an order directing the clerk of court to transfer from *WVUH II* to the docket of this case all of the docket entries concerning Plaintiff's motion for a temporary restraining order and preliminary injunction.  (*See* Doc. 12.)  Those documents are now docketed as Documents 13-26 in this matter.

[3]In its November 5, 2007 memorandum in 1:CV-06-0082, the court spent considerable time detailing the statutory framework and legislative enactments which enable Pennsylvania to make Trauma DSH payments with combined federal and state money.  The court will not reiterate that background here as it is familiar to all of the parties.

[4]WVUH also contended that Defendants violated § 1983 because their state medicaid plan
(continued...)

4

Ultimately, the court agreed with WVUH.  As to its equal protection claim, the court concluded that rational basis review applied, but that even with this low threshold, the Commonwealth's actions could not be justified:

> Defendants' denial of Trauma DSH payments to all out-of-state hospitals fails rational basis review.  The classification at issue here is a distinction between in-state and out-of-state hospitals providing trauma treatment to Pennsylvania residents.  The state's proffered justification—improvement of access to trauma care for Pennsylvania residents—is not rationally related to the denial of the Trauma DSH payment to all out-of-state hospitals.  Pennsylvania residents are routinely treated at out-of-state hospitals that are closer to their homes than Pennsylvania hospitals, or which are more capable of addressing their medical needs than Pennsylvania hospitals.  Accordingly, because there is no rational relationship between improving access to trauma care, and the denial of Trauma DSH payments to out-of-state hospitals, the court will grant summary judgment in favor of WVUH on the equal protection claim.

(1:06-cv-0082, Doc. 55 at 17.)

The court reached a similar conclusion concerning WVUH's Commerce Clause argument.  First, the court dismissed Defendants' assertion that the Commerce Clause was inapplicable because, according to Defendants, Trauma DSH payments constituted a direct subsidy to in-state hospitals, and thus fall within a "subsidies" exception to the Commerce Clause.  The court found this argument to be untenable in light of the dual state/federal nature of the funding for the subsidies, and the fact that by having incorporated the subsidies into their state Medicaid plan, the Commonwealth could not choose to withhold those payments in contravention

---

[4](...continued)

failed to adequately provide for services to Pennsylvania residents who are absent from the state in accordance with 42 U.S.C. § 1396a(a)(16).  The court denied WVUH summary judgment on that claim, finding that § 1396a(a)(16) did not confer an enforceable federal right under § 1983.  (*See* 1:06-cv-0082, Doc. 55 at 13-14.)

of that plan. (*Id.* at 19-20.) Finally, as to the substance of WVUH's Commerce Clause argument, the court found that the Trauma Act's facial discrimination against out-of-state hospitals treating Pennsylvania Medicaid patients deserved heightened scrutiny, and that the Commonwealth articulated no legitimate basis for denying WVUH Trauma DSH payments while making these payments to in-state hospitals. (*Id.* at 20-21.) Accordingly, the court granted WVUH summary judgment on both its Equal Protection and Commerce Clause claims. (*Id.* at order.)

In its November 5, 2007 memorandum and order, the court deferred entry to judgment and conducted a conference call with the parties. That call was held on November 20, 2007. The purpose of the call was to allow the parties to assist in structuring a judgment and remedy consistent with the court's November 5, 2007 memorandum and order. After this conference call, the parties submitted short briefs concerning the scope of the injunction desired. Not surprisingly, the Commonwealth wanted a very narrow injunction, and WVUH wanted a broad injunction. In its brief, the Commonwealth argued that the court's November 7, 2009 memorandum narrowly determined that the Commonwealth cannot deny Trauma DSH payments to WVUH "**solely on the basis of the hospital' [sic] out-of-state location[,]**" and that the court "can[not] enjoin them from excluding Plaintiff from [Trauma DSH payments] on grounds other than its out-of-state location." (1:06-cv-0082, Doc. 61, Defs.' Mem. of Law Re: Remedy, at 2 (emphasis in original).) The Commonwealth went on to state—either prophetically or because it intended at that point to take this very step—that "nothing in the [c]ourt's opinion addressed the reasonableness of other requirements imposed by the Trauma Act, such as accreditation by the Pennsylvania Trauma Systems Foundation," and stated

6

its position that "it is difficult to understand how reasonable accreditation requirements applied to all applicants, regardless of location, could violate the Equal Protection or Commerce Clauses." (*Id.*) Finally, in a footnote, Defendants took the position that the court's November 7, 2007 decision "effectively voided the Trauma Act by declaring unconstitutional a definition which is essential to and cannot be severed from the Act." (*Id.* at n.1.)

For its part, WVUH stated that it has already demonstrated that it is similarly situated to other in-state trauma centers, and the Commonwealth's "suggestion that accreditation by the Pennsylvania Trauma Systems Foundation could be a reasonable basis for denying payment is without merit" because "[b]y statute, the role of [PTSF] is to establish standards for the operation of trauma centers <u>in this Commonwealth.</u>" (Doc. 62, Pl.'s Resp. to Defs.' Mem. of Law Re Remedy, at 2-3 (footnote and internal quotations omitted) (emphasis in original).) WVUH also chafed at Defendants' suggestion that the entire Trauma Act was void, and instead argued that the court declared void only those sections of the Trauma Act that require geographic location in the Commonwealth and, because its jurisdiction is limited to the Commonwealth, the requirement for accreditation by PTSF. (*Id.* at 3.) According to WVUH, the affected parts of the Trauma Act were the definition of "hospital" and the definition of "trauma center" in 35 Pa. Cons. Stat. Ann. § 6943.2; the requirement for a list of Level I and Level II hospitals accredited by PTSF in 35 Pa. Cons. Stat. Ann. § 6943.4; and the requirement for PTSF data in 35 Pa. Cons. Stat. Ann. § 6943.5(c)(2). (*Id.* at n. 4.)

The parties respective post-summary judgment memoranda are snapshots of the dispute that is presently before the court, and if the court had been a

better seer it would have explicitly dealt with these issues at that point in time; however, because the court's power of divination was limited, on December 12, 2007, the court issued the following order, only the relevant parts of which appear below:

> 2) The Pennsylvania Trauma Systems Stabilization Act, 35 Pa. Cons. Stat. Ann. §§ 6943.1 et seq. ("Trauma Act") is unconstitutional to the extent that it denies trauma disproportionate share hospital payments ("Trauma DSH Payments") to out-of-state hospitals serving Pennsylvania Medicaid patients. *Those sections of the Trauma Act that limit eligibility for Trauma DSH payments to hospitals located in the Commonwealth of Pennsylvania are void.*
>
> 3) Pennsylvania State Plan Amendment 04-009, the part of the Pennsylvania State Plan under Title XIX of the Social Security Act *that establishes a class of disproportionate share payments to be distributed to hospitals located in the Commonwealth of Pennsylvania that are accredited as trauma centers by the Pennsylvania Trauma Systems Foundation, is unconstitutional to the extent that it limits eligibility for Trauma DSH payments to hospitals located in the Commonwealth of Pennsylvania.*
>
> 4) Consistent with the existing Pennsylvania State Plan under Title XIX of the Social Security Act, Commonwealth of Pennsylvania Methods and Standards for Establishing Payment Rates – Inpatient Hospital Care, Attachment 4.19A, which requires that an out-of-state acute care general hospital that treats in any one fiscal year more than 400 Pennsylvania medical assistance inpatient cases be paid in accordance with methods and standards applied to in-state inpatient hospitals for acute care services, *Defendants shall treat WVUH as an in-state hospital for purposes of determining WVUH's eligibility for Trauma DSH payments.*
>
> 5) Defendants shall not make or distribute any Trauma DSH payments to any eligible provider until a state plan amendment has been fully approved and implemented. If approval and implementation of the state plan amendment requires amendment of the Trauma Act or other statute, Defendants shall not make or distribute any Trauma DSH payments to any eligible provider until an amended statute

8

is passed and effective and whose constitutionality has
been approved by this Court.

(1:CV-06-0082, Doc. 63 (emphasis added).)

 A plain reading of this order demonstrates that the court did not declare the entire Trauma Act void on its face; rather, the court declared only those portions of the Act, and the then-existing state plan, unconstitutional that denied Plaintiff the ability to receive Trauma DSH payments solely because is was located out-of-state. The court agrees with WVUH's position that the relevant sections of the Trauma Act affected by the court's November 7, 2007 memorandum and its December 12, 2007 order are the following: (1) the definition of "hospital" and "trauma center" located at 35 Pa. Cons. Stat. Ann. § 6943.2; (2) the requirement contained in section 6943.4 requiring PTSF to prepare a list of the accredited Level I and II trauma centers; and (3) the requirement that the Commonwealth use data from PTSF to calculate payment distribution to level I and III trauma centers.[5]

 The court's order invalidated those sections of the Trauma Act which make distinctions between trauma centers located in-state that treat Pennsylvania Medicaid patients, and those located out-of-state that treat Pennsylvania Medicaid patients. With this in mind, the court turns to the events that occurring after the issuance of the December 12, 2007 order.

---

[5]Whether only certain sections of the Trauma Act are void or whether the whole Act is void is not extremely important to the dispute presently before the court. The Commonwealth appears to believe that it does not need the Trauma Act to make Trauma DSH payments pursuant to an approved plan by the Centers for Medicare and Medicaid, and WVUH has not challenged the Commonwealth's ability to make Trauma DSH payments generally, just the current state plan amendment requiring that WVUH be accredited by PTSF. That dispute—PTSF accreditation—is not dependent upon whether the entire Trauma Act is void or only certain sections are void. If the entire Act is void, there is no statutory basis for the Commonwealth to insist on PTSF accreditation, and, if only certain sections of the Act are void, it necessarily includes those sections that require accreditation by PTSF.

## B. Preliminary Injunction Hearing

The court held a hearing on August 13, 2009, on WVUH's motion for a preliminary injunction. At that hearing, the court heard testimony from five witnesses, and admitted into evidence hundreds of exhibits by both parties.[6] Based on the evidence provided at that hearing, the court finds the following facts.

### 1. The non-party actors

Although the parties in this case are well known to the court, and their relationship was described in detail in the court's November 5, 2007 memorandum, the current case presents two new non-parties who are relevant to the case as a whole, and thus some background as to who they are is necessary.

### a. Pennsylvania Trauma Systems Foundation

The Pennsylvania Trauma Systems Foundation was formed through the EMS Act of 1985 to create standards for the operation of trauma centers in the Commonwealth of Pennsylvania. (Aug. 13, 2009 Tr. of Proceedings ("Tr.") at 120.)

---

[6]At the hearing, the court reserved ruling on whether Plaintiff's Exhibit 12 was admissible. Defendants objected to its admission on the basis of relevance. Exhibit 12 is an information bulletin from the Pennsylvania Department of Health Bureau of Emergency Medical Services defining a protocol for the destination of air ambulance trauma patients. Among other things, this protocol explicitly lists WVUH as an appropriate destination of Pennsylvania trauma patients being transported by air ambulance, and, in fact, specifically states that WVUH, among others, is an out-of-state hospital with qualifications and accreditation processes similar to Pennsylvania. The issue before the court in this case is whether the Commonwealth's decision to require WVUH to obtain PTSF accreditation, instead of accepting the accreditations that it already has, as a prerequisite to receiving Trauma DSH money violates the court's December 12, 2007 order by impermissibly restoring a portion of the Trauma Act that the court declared unconstitutional; and, if not implicitly prohibited by the court's December 12, 2007 order, whether requiring PTSF accreditation violates the Commerce Clause and WVUH's Equal Protection rights. In this context, the court believes that it is relevant that another agency under the jurisdiction of the governor—the Department of Health—believes that WVUH has similar accreditation requirements to Pennsylvania hospitals accepting trauma patients. Accordingly, the court overrules Defendants' relevancy objection, and admits into evidence Plaintiff's Exhibit 12.

Under the current version of the EMS Act,[7] the PTSF is defined as "a nonprofit Pennsylvania Corporation whose is function it to accredit trauma centers in this Commonwealth." 35 Pa. Cons. Stat. Ann. § 6923. According to the language of the Trauma Act, in order to receive Trauma DSH payments, a trauma center must be accredited by PTSF. 35 Pa. Cons. Stat. Ann. § 6943.1. PTSF has never accredited an out-of-state hospital. (Tr. at 130-31.)

### b. HAP

The Hospital and Health System Association of Pennsylvania ("HAP") is a trade group representing hospitals in the Commonwealth of Pennsylvania by providing technical assistance, research, and educational services. (Tr. at 184.) HAP represents the interests only of hospitals, including trauma centers, physically located in Pennsylvania. HAP plays no statutory role in deciding who gets Trauma DSH money.

### 2. Events following the court's decision in *WVUH II*

### a. Discussions between HAP, PTSF and DPW

Following the court's November 5, 2007 memorandum, and before the court's December 12, 2007 order, representatives from DPW began communicating with representatives from PTSF and HAP concerning how DPW would comply with the court's injunction. On November 13, 2007—eight days after the court's

---

[7]On August 18, 2009, Governor Rendell signed Act 135 of 2009 the Emergency Medical Services Systems Act, which abrogated the EMS Act of 1985 and replaced it with a new chapter in title 35. *See* 35 Pa. Cons. Stat. Ann. §7201 *et seq.* Among the changes made, Act 135 amended the definition of PTSF to remove the limitation that PTSF only accredit trauma centers "located in this Commonwealth." The new definition states that PTSF is "a nonprofit Pennsylvania corporation whose function is to accredit trauma centers that receive or seek to receive Commonwealth funds." 35 Pa. Cons. Stat. Ann. § 7203. Act 135 takes effect on February 14, 2010. The court discusses the effect of this amendment in Part III.A.i.,n.12, *infra.*

memorandum was issued—a senior vice president of HAP e-mailed a representative for DPW seeking to discuss with DPW whether DPW should appeal this court's decision in *WVUH II.* (Pl.'s Ex. 17.)[8] At a meeting on December 14, 2007—two days after the court's judgment—representatives from DPW, HAP, and PTSF held a meeting where they discussed payment of Trauma DSH payments to WVUH. (Tr. at 61.) At this meeting, the participants discussed at least two options for including WVUH in Trauma DSH payments. (*See* Pl.'s Ex. 91.) One option was to require WVUH to be accredited by PTSF as a condition of receipt of Trauma DSH payments, but at least initially, the parties at this meeting did not believe that this was legally possible because the legislation that created PTSF limited its authority to accrediting Pennsylvania hospitals. (Tr. at 61; Pl.'s Ex. 91.) The second option was to accept WVUH's accreditation by ACS and the State of West Virginia. (Pl.'s Ex. 91.)

On January 24, 2008, the PTSF board of directors met to discuss, among other things, the court's decision in *WVUH II.* At this meeting, it was revealed that HAP, DPW and PTSF had met three times since the court's decision, and that they were "attempting to develop a formula which will limit any funding a non PA trauma center will get." (Pl.'s Ex. 50.)

### b. Funding for FY 2007-2008

Trauma DSH payments are typically dispersed in late June. By June 2008, a new state Medicaid plan that complied with the court's injunction had not yet been implemented; nevertheless, the parties reached an agreement regarding the

---

[8]References to exhibits in this memorandum refer to those exhibits admitted into evidence during the preliminary injunction hearing held on August 13, 2009.

disbursement of Trauma DSH payments for the 2007–2008 state fiscal year, (*see* 1:06-cv-0082, Doc. 74), and on June 17, 2008, the court issued an order modifying the December 12, 2007 order to permit the distribution of Trauma DSH payments for the 2007–2008 year only. (*See id.*) As a part of the negotiating for the stipulation and state plan for FY 2007-2008, DPW acknowledged that PTSF has the authority to accept the accreditation of another entity, and, at least for that year, intended to accept ACS's accreditation of WVUH. (Defs.' Ex. 7.) Various correspondence between the parties refers to this as an "interim" or short term agreement, with the expectation that the long term solution involved amending the Trauma Act. (*See* Defs.' Exs. 5-9.)

On or about June 27, 2008, the Commonwealth, through DPW, submitted to the Centers for Medicare and Medicaid Services ("CMS") for approval a proposed state plan amendment that provided for a Trauma DSH payment for fiscal year ending June 30, 2008 that would pay WVUH $820,709.17. (Defs.' Ex. 3 at Attach. 4.19A.) That plan unequivocally stated that "[f]or future Trauma DSH payments, [this court's order in *WVUH II*] shall remain in full force and effect." (*Id.*)

### c. Events after July 1, 2008

At some point after the FY 2007-2008 plan was submitted and the stipulation approved by this court, DPW decided that in order to receive Trauma DSH funds that WVUH would have to be accredited by PTSF, and that PTSF would not accept the accreditation of ACS or any other entity. (Defs.' Ex. 10-11.) Although no legislation had been enacted amending the Trauma Act, and no new state plan amendment had been approved, on August 26, 2008 the Commonwealth,

13

through its attorney, informed WVUH that "in order to receive any [Trauma DSH] payments in the future, WVUH will have to be accredited by the [PTSF]." (Pl.'s Ex. 24.) In that letter, the Commonwealth states that its "'long term' plan is to submit a proposed state plan amendment which continues the program as it is—if [WVUH] obtains the necessary accreditation, WVUH will continue to be paid under the same formula as is in place under the existing state plan." (*Id.* at 2.)

After receiving the Commonwealth's August 26, 2008 letter, WVUH responded that it would not seek accreditation by PTSF because it did not believe that PTSF had the authority to accredit it, and, that such accreditation would be redundant and costly since it was already an accredited Level I trauma center. (Pl.'s Ex. 25.) After the exchange of these letters, the parties continued to discuss the situation but never reached common ground. (*See* Pl.'s Exs. 26 & 27.)

On February 21, 2009, Defendants published a notice in the Pennsylvania Bulletin announcing its intent to amend the Trauma DSH payment methodology. *See* 39 Pa.Bull. 1068 (Feb. 21, 2009). On March 27, 2009, Defendants submitted the Pennsylvania state plan, including the proposed Trauma DSH amendment, to the Centers for Medicare and Medicaid Services ("CMS") for approval. (Defs.' Ex. 4.) The proposed plan amendment states, "West Virginia University Hospital (WVUH) shall be treated as an in-State hospital for purposes of determining WVUH's eligibility for (including its accreditation status) and calculation of the amount of Trauma DSH payments." (*Id.* at Attach. 4.19A.) However, the proposed plan amendment restricts payments "to hospitals that are accredited by the Pennsylvania Trauma System Foundation (Foundation) as trauma centers." (*Id.*) The plan has not yet been approved by the CMS. (Doc. 31, Defs.'

Br. in Opp. to Preliminary Inj. at 12.)  According to Defendants, once the amendment is approved, Trauma DSH funds will be distributed only to those hospitals which have been accredited by the PTSF as Level I, II, or III trauma centers.

### 3.    **Plaintiff's Expert**

At the hearing on Plaintiff's preliminary injunction, WVUH introduced the testimony of Dr. David Kappel.  The parties agreed to submit Dr. Kappel's testimony by video deposition, and Defendants did not object to Dr. Kappel testifying as an expert on "ACS verification, West Virginia accreditation and accreditation standards and processes generally." (Aug. 5, 2009 Video Dep. of Dr. David A. Kappel ("Kappel Dep.") at 26:18-24.)  Dr. Kappel testified that PTSF accreditation standards, while quantitatively greater in number, do not produce qualitatively better patient care and outcomes.  (Kappel Dep. at 65-86, 94-107.)  Dr. Kappel reviewed the testimony of Juliet Geiger, the executive director of PTSF, where Ms. Geiger indicated that there was at least one study and poster presentation suggesting that PTSF standards do produce better outcomes relating to mortality rates.  (*Id.* at 87-89.)  According to Dr. Kappel, the study mentioned by Ms. Geiger does not indicate that PTSF standards are qualitatively better than ACS standards or West Virginia standards in terms of better outcomes or better care.  (*Id*. at 89.)

At the hearing, when asked if she were aware of any studies relevant to the question of whether PTSF standards result in higher quality of care than the ACS standards, Ms. Geiger testified vaguely and ambiguously: "Not in its entirety, that the two processes differ in any way.  Related to specific standards, there are research articles out there." (Tr. at 136:23-25.)  At this stage of the proceedings, and simply

15

for the purpose of Plaintiff's motion for a preliminary injunction, the court accepts the testimony of Dr. Kappel that there are no qualitative differences between PTSF standards and ACS and West Virginia standards in terms of patient care and patient outcomes.[9]

## II.        Legal Standard

The test for whether to grant a preliminary injunction requires the court to consider four factors:

> (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the non-moving party; and (4) whether granting the preliminary relief will be in the public interest.

*ACLU of N.J. v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc); *Miller v. Skumanick*, 605 F. Supp. 2d. 634, 641 (M.D. Pa. 2009). The above factors merely "structure the inquiry" and no one element will

---

[9]Defendants argue that Dr. Kappel's opinion is not worthy of consideration because of his affiliation with WVUH, and because he admitted at his deposition that he did not do a literature review to determine whether there were or were not studies that conflicted with his opinion, and thus his opinion that he is aware of no studies suggesting a qualitative difference in patient outcomes where PTSF standards are applied compared to ACS or West Virginia standards is worthless. The court disagrees. First, there is nothing in Dr. Kappel's testimony suggesting an inherent bias in favor of West Virginia. Defendants intimation that Dr. Kappel is biased because he is affiliated with WVUH without some evidence demonstrating bias is hollow. Second, while it is unusual for an expert to opine that he is not aware of any studies concerning a particular topic while at the same time admitting that he did not do a literature review, Defendants have not demonstrated that Dr. Kappel is in fact incorrect that there are no studies discussing the qualitative differences between PTSF standards and ACS or West Virginia standards. While Ms. Geiger mentioned a poster presentation and article in her deposition, Dr. Kappel reviewed this material and discounted it. Moreover, the fact that Ms. Geiger suggested that there are "research articles out there" concerning specific standards as they relate to patient outcomes, is unhelpful without the articles themselves and opinion testimony concerning the articles. Defendants will have the opportunity to conduct discovery and retain their own expert for a trial on the merits, but at this point they have not proffered sufficient evidence to rebut Dr. Kappel's testimony or to significantly diminish his credibility.

necessarily determine the outcome.  The court must engage in a delicate balancing of all the elements, and attempt to minimize the probable harm to legally protected interests between the time of the preliminary injunction to the final hearing on the merits.  *Miller,* 605 F. Supp. 2d. at 641 (citing *Constructors Assoc. of Western Pa. v. Kreps*, 573 F.2d 811, 815 (3d Cir. 1978)).  The movant bears the burden of establishing these elements.  *Id.*  (citing *Adams v. Freedom Forge Corp*., 204 F.3d 475, 486 (3d Cir. 2000)).

**III.**        **Discussion**

The issue before the court is whether to grant a preliminary injunction enjoining Defendants from making Trauma DSH payments to any trauma center pursuant to the Trauma Act and the state plan amendment submitted to CMS. WVUH argues that it has met all of the elements of the test, and that an injunction is necessary to prevent the Commonwealth from paying Trauma DSH money to Pennsylvania hospitals once the plan amendment is approved.  WVUH argues that without an injunction, it will be left holding a hollow right to sue the Commonwealth because the Eleventh Amendment would bar it from seeking damages.  The Commonwealth takes the position that WVUH has not demonstrated a likelihood of success on the merits of its case, and that even if it has, there is no need to enjoin the Commonwealth from making Trauma DSH payments to other accredited hospitals because there will be more than sufficient resources available to pay WVUH its share, should the court decide that WVUH is entitled to a Trauma DSH payments, from the Level III funding.  For the reasons that follow, the court will grant WVUH's motion for a preliminary injunction.

## A.    Likelihood of success on the merits

To show a reasonable likelihood of success on the merits, WVUH need only show that is has a "reasonable probability" of success on the merits. *See Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir. 1981).  In its complaint, WVUH argues that the proposed state plan amendment, (Defs.' Ex. 4, SPA # 09-003, Attach. 4.19A), violates: (1) the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, (Doc. 1, Count I); (2) the Commerce Clause at Article 1, § 8 of the United States Constitution, (*Id.*, Count II); and, (3) this court's December 12, 2007 order, (*Id.*, Count IV.).  The court will address each of these, although in a somewhat different order.

### i.  The Court's December 12, 2007 order

As explained in detail above, in its December 12, 2007 order, the court found the Trauma Act unconstitutional to the extent that it "denies [Trauma DSH] payments [] to out-of-state hospitals serving Pennsylvania Medicaid patients[,]" and that those section of the Trauma Act "that limit eligibility for Trauma DSH payments to hospitals located in the Commonwealth of Pennsylvania are void." (1:06-cv-0082, Doc. 63.)  WVUH argues that when the unconstitutional portions of the Trauma Act are excised, what remains is an authorization for distribution of Trauma DSH payments to hospitals accredited as Level I, II, and III trauma centers. The court agrees with WVUH's reading of its order.  The court did not declare the entire Trauma Act unconstitutional; rather, only those parts that treated WVUH differently by virtue of the fact that it was located out-of-state were declared void, and are unenforceable.

Unfortunately, the court was not specific in declaring which sections were, and which were not, included in this ruling. Obviously, those provisions that on their face make distinctions based on geography are void. For instance, the definition of "hospital" contained in § 6923.2 is void because it limits Trauma DSH payments to only those entities located in the Commonwealth.[10] WVUH takes the position that the court's ruling necessarily includes the definition of "trauma center" which requires that a hospital be accredited as a Level I, II, or III trauma center by the PTSF, and §§ 6943.3(a) and 6943.4(a) setting forth various accreditation and reporting requirements by the PTSF. WVUH's position is that because PTSF, through its enabling legislation, was created solely to accredit trauma centers located "in this Commonwealth" that it does not have the authority to accredit out-of-state hospitals. 35 Pa. Cons. Stat. Ann. § 6923. Additionally, PTSF's by-laws state that PTSF was established and will be exclusively operated for the purpose of, among other things, "establish[ing] standards for the operation of trauma centers in Pennsylvania."[11] (Defs.' Ex. 16, PTSF by-laws, Art. II, ¶ (a).) Finally, PTSF accreditation standards include certain geographic requirements that WVUH cannot meet solely by virtue of its geographic location. For instance, PTSF requires accredited trauma centers to be "licensed by the Pennsylvania Department of

---

[10]It is unclear why the General Assembly chose to define the term "hospital" so narrowly for purposes of the Trauma Act when it set a much broader definition in the EMS Act of 1985. *See* 35 Pa. Cons. Stat. Ann. § 6923.

[11]Inexplicably, the Commonwealth states in its brief that PTSF's by-laws "contain no geographic limitation on PTSF's power to accredit trauma centers." This position is apparently based on the fact that ¶¶ (b) through (f) in Article II of its by-laws do not reiterate what was stated plainly in ¶ (a), which is that PTSF was formed to "establish standards for the operation of trauma centers *in Pennsylvania*." (Defs.' Ex. 16, PTSF by-laws, Art. II, ¶ (a) (emphasis added).) Defendants' reasoning is specious, and they have come forward with no evidence at this stage of the proceedings suggesting that ¶ (a) of the by-laws does not impose a geographic limitation on the remaining paragraphs.

Health." (Pl.'s Ex. 2, PTSF, 2009 Standards for Trauma Center Accreditation, Std. I.D.) In essence, WVUH argues since PTSF is not authorized to accredit out-of-state hospitals—either by authorizing statute or through its by-laws—and because PTSF accreditation standards impose conditions that it cannot possible meet by virtue of its geography, those sections of the Trauma Act requiring PTSF accreditation are also void per the court's December 12, 2007 order, and the plan amendment proposed by the Commonwealth to CMS attempts to impermissibly restore those parts of the Trauma Act.

The Commonwealth takes the position that the court's December 12, 2007 ruling was very narrow, and that nothing in the court's opinion or order addressed the reasonableness of other requirements imposed by the Trauma Act on applications for Trauma DSH payments, such as PTSF accreditation. The Commonwealth also argues that by requiring PTSF accreditation it is treating WVUH identically to other trauma centers desiring Trauma DSH money, and that to the extent that there are PTSF requirements that cannot be met because WVUH is located in West Virginia that neither DPW nor PTSF will use these requirements to exclude WVUH from PTSF accreditation.

On the record before it, the court concludes that WVUH has come forward with sufficient evidence demonstrating that it has a reasonable probability of success on the merits of its claim that the Commonwealth's state plan amendment requiring accreditation by PTSF violates the court's December 12, 2007 order. While Defendants stated at the preliminary injunction hearing and in their briefs that they would not use any PTSF standards to evaluate WVUH that are impossible for WVUH to meet because of its geographic limitation, the proposed plan amendment

makes no allowance for WVUH to demonstrate substantial equivalence with these standards. In fact, the proposed plan amendment unequivocally states that "[WVUH] shall be treated as an in-state hospital for purposes of determining WVUH's eligibility for (including but not limited to its accreditation status) and calculation of the amount of Trauma DSH payments." This statement makes no allowance for accreditation standards that WVUH cannot possibly meet because of its geographic location. As such, there is a reasonable probability that the current proposed plan amendment—# 09-003— suffers from the same flaws as the plan amendment this court ruled unconstitutional in its decision in *WVUH II*. Furthermore, WVUH has demonstrated a reasonable probability of success on its claim that requiring PTSF accreditation as a prerequisite for a FY 2008-2009 Trauma DSH payment when both the EMS Act of 1985 and PTSF's own by-laws limit its ability to accredit trauma centers to only those centers located "in this Commonwealth" violates this court's December 12, 2007 order because it places a condition precedent on WVUH for its receipt of Trauma DSH payments that it cannot meet solely because it is not located "in this Commonwealth."[12] Accordingly, WVUH has demonstrated a likelihood of success on the merits of its claim that the proposed state plan violates the court's December 12, 2007 order.

---

[12]This case is muddied by the fact that on August 18, 2009, Governor Rendell signed Act 135 of 2009 which amends the authorizing legislation that established PTSF and purports to give PTSF the right to accredit trauma centers that receive or seek to receive Commonwealth funds. Act 135 may very well solve the accreditation problem; although, per this court's December 12, 2007 order any legislation that is proposed to fix the unconstitutional parts of the Trauma Act must be reviewed by this court. Furthermore, it remains to be seen whether the requirement of PTSF accreditation is rationally related to the Commonwealth's goal of a comprehensive trauma system designed to improve access to readily available and coordinated trauma care for the citizens of Pennsylvania. That issue will be decided on the merits in this case, and it would be premature for the court to rule on it at this stage without the benefit of a full record.

## ii. **Equal Protection**

Although it is not entirely clear from its brief, it appears that WVUH's equal protection argument is premised on the fact that requiring PTSF accreditation would unconstitutionally subject WVUH to the burden of multiple accreditation—a condition not imposed on Pennsylvania hospitals.

The Equal Protection Clause of the Fourteenth Amendment protects against arbitrary government action by requiring similar treatment of those who are similarly situated. U.S. Const. amend. XIV, § 1; *City of Cleburne v. Cleburne Living Cntr.*, 473 U.S. 432, 439 (1985); *Plyler v. Doe*, 457 U.S. 202, 216 (1982). When the state makes a classification based on economics or social welfare—as opposed to a suspect class such as race, gender, or national origin—rational basis is the appropriate standard of review. *Dandridge v. Williams*, 397 U.S. 471, 485 (1970); *Village of Belle Terre v. Boraas*, 416 U.S. 1, 8 (1974); *Matthews v. De Castro*, 429 U.S. 181, 185 (1976); *Hodel v. Indiana*, 452 U.S. 314, 331-32 (1981). Under this standard, the challenger bears the burden of demonstrating either that the law has no legitimate purpose, or that the means used to achieve its purpose are not rationally related to that purpose. There is a strong presumption of validity in favor of laws challenged under rational basis, *see McGowan v. Md.*, 366 U.S. 420, 425-26 (1961), and government action is not unconstitutional so long as "the law [is] reasonable, not arbitrary, and bears a rational relationship to a permissible state objective." *Village of Belle Terre*, 461 U.S. at 8.

WVUH argues that it is already accredited by ACS and the State of West Virginia, and that the Commonwealth has come forward with insufficient evidence demonstrating that the differences between accreditation by these two

entities and the standards used by PTSF produce any qualitative difference in the level of care provided to trauma patients. Without a qualitative difference in the level of care provided by different accreditation standards, WVUH argues that the Commonwealth's decision to require PTSF accreditation is arbitrary and irrational.

In support, Plaintiff introduced the testimony of expert witness Dr. David A. Kappel. At various points throughout his deposition, Dr. Kappel testified that PTSF standards do not produce qualitatively different results in terms of better care or better outcomes for patients than do ACS or West Virginia standards. (*See e.g.,* Kappel Dep. 81:2-6; 82:22-83:4.) At the hearing, over WVUH's objection, Defendant introduced the testimony of Juliet Geiger, the executive director of PTSF who stated that she did believe that PTSF standards produced better outcomes for patients, and that she believed that there were studies demonstrating such. (Tr. at 128, 135-36.) WVUH also argues that the fact that Pennsylvania acknowledges West Virginia accreditation for purposes of transporting Pennsylvania trauma patients to WVUH, (*see* Defs.' Ex. 12), yet refuses to recognize that West Virginia accreditation is acceptable when it comes to sending Trauma DSH payments to WVUH, demonstrates the irrationality of the Commonwealth's position. For its part, Defendant simply responds that because all trauma centers—in-state or out-of-state—must be accredited by PTSF there is no violation of the Equal Protection Clause because WVUH is being treated the same as Pennsylvania hospitals. The Commonwealth also adds that it is not requiring multiple accreditation by insisting on PTSF accreditation because it does not require that WVUH be accredited by ACS or the State of West Virginia—those are requirements of WVUH's home state.

Based on the exhibits and testimony presented at the preliminary hearing, including the testimony of Dr. Kappel, the court finds that WVUH has established a reasonable probability of prevailing on the merits of its Equal Protection claim. Absent evidence that PTSF accreditation standards lead to qualitatively better care and treatment of Pennsylvania trauma patients than do ACS and West Virginia standards, the court finds it unlikely that the Commonwealth's refusal to accept WVUH's existing accreditations in lieu of PTSF accreditation for purposes of receiving Trauma DSH payments would pass rational basis scrutiny. Of course, this is not a decision on the merits. The Commonwealth has not yet had an opportunity to conduct discovery or retain its own expert. Nonetheless, based on the evidence that the court has in front of it now, it finds that WVUH has established a reasonable likelihood of success on the merits of its Equal Protection claim.

### iii.  <u>Commerce Clause</u>

WVUH levels several Commerce Clause arguments at the Commonwealth's requirement that it obtain PTSF accreditation in order to receive Trauma DSH money. Before the court addresses these arguments, it is necessary to briefly discuss the framework for the court's analysis.

The United States Constitution provides that "Congress shall have Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8. While the Commerce Clause explicitly speaks only to the power of Congress to regulate interstate commerce, it has been interpreted to contain "an implied limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652 (1981). This implied limitation is sometimes referred to

24

as the 'negative' or 'dormant' Commerce Clause, and it is this aspect of Commerce Clause jurisprudence that is at issue in this case.

The dormant Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988). State legislative enactments, executive regulations and judiciary approved rules can all be subject to Commerce Clause analysis. *See, e.g.*, *New Energy Co.*, 486 U.S. 269 (statute); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, (1970) (executive order); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975) (judiciary-approved rule). While not exactly on point, this court believes that DPW's executive decision to require PTSF accreditation is on par with the cases cited above.

When conducting a dormant Commerce Clause analysis, the court must balance the national interest in vibrant interstate commerce with the local interests promoted by the state regulation. In *Pike*, the Supreme Court stated that

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld *unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits*. . . . If a legitimate local purpose is found, then the question becomes one of degree.

397 U.S. at 142 (citation omitted) (emphasis added). Later, in *Brown-Forman Distillers Corp. v. N.Y. Liquor Auth.*, 476 U.S. 573 (1986), the Supreme Court refined its Commerce Clause analysis by holding that when a state statute "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," it may generally be struck

25

down without further inquiry. 476 U.S. at 578-79; *see also Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 824 (3d Cir. 1994). On the other hand, when a statute only indirectly affects interstate commerce and regulates evenhandedly, a determination must be made as to whether the State's interest is "legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown-Forman*, 476 U.S. at 579 (citing *Pike*, 397 U.S. at 142). In both cases, however, "the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.* Finally, the Third Circuit noted in *Tolchin v. Supreme Ct. of New Jersey,* 111 F.3d 1099 (3d Cir. 1997), that a district court need not engage in *Pike* balancing unless the state's action is not only "facially neutral, but . . . also . . . neutral in effect." 111 F.3d at 1107.

Here, WVUH argues that the Commonwealth's requirement that it obtain PTSF accreditation in order to receive Trauma DSH payments directly regulates interstate commerce, and thus is subject to heightened scrutiny, because it has impermissible extraterritorial effects. The court need not determine at this stage whether the Commonwealth's insistence on PTSF accreditation directly regulates commerce which occurs wholly outside the borders of Pennsylvania, because even if such a requirement is considered to be even-handedly applied to in-state and out-of-state hospitals, the court finds that WVUH has demonstrated that it has a reasonable probability of succeeding on the merits of its claim based on the outcome of *Pike* balancing. That is to say, WVUH has demonstrated a reasonably probability of showing that the burden of PTSF accreditation is clearly excessive in relation to the putative local benefits desired by the Commonwealth.

As indicated above, unless the Commonwealth can demonstrate a qualitative difference in terms of patient care and outcomes from requiring PTSF accreditation versus accepting the accreditation of ACS and West Virginia, it will have a difficult time convincing this court that there is a rational connection between its stated purpose—quality, coordinated trauma care for Pennsylvania citizens—and its insistence on PTSF accreditation. At the hearing, both parties presented evidence that accreditation is time consuming and expensive both in terms of fees and costs, as well as employees needed to comply with accreditation reporting requirements. While the court cannot say that WVUH presented *overwhelming* evidence that the burdens on it would be unduly onerous, it has, nonetheless, presented *sufficient* evidence to suggest that burdens do in fact exist and, in contrast to the dearth of evidence—at least at this stage of the proceedings— concerning a rational connection between requiring PTSF accreditation and a qualitative difference in patient outcomes—i.e., the putative local benefit—the court concludes that WVUH has established a reasonable probability of success on the merits of its Commerce Clause claim.[13]

---

[13]In its brief in opposition to WVUH's motion for preliminary injunction, Defendants argue that Plaintiff cannot demonstrate a likelihood of success on the merits of its Commerce Clause claim because the Commerce Clause does not apply to the situation at hand because the Commonwealth is acting not as a regulator but rather as a market participant. Defendants argue that the Commonwealth is acting only as a purchaser of services, paying WVUH for the services that it provides to some Pennsylvania residents. This argument appears to be nothing more than a recycled effort by the Commonwealth to resurrect the market participant exception that it made in *WVUH II*. There, the Commonwealth argued that it was merely being philanthropic with its subsidies, and that it did not violate the Commerce Clause by preferring in-state hospitals to out-of-state hospitals. The court flatly rejected this argument in *WVUH II* and will not entertain it here. Trauma DSH payments are funded jointly with federal and state money, and the Commonwealth has included these payments in their state Medicaid plan. Unlike a market participant purchasing other goods and services, because these payments are in the state plan the Commonwealth cannot choose to withhold them in contravention of

(continued...)

## B. Irreparable Harm

In addition to establishing that it has a likelihood of success on the merits of its case, WVUH also has the burden of demonstrating that it will suffer irreparable harm absent injunctive relief. Generally, irreparable harm is harm that "cannot be redressed by a legal or equitable remedy following trial." *Instant Air Freight Co. v. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir. 1989).

Here, WVUH argues that absent an injunction it will suffer irreparable harm because once the Trauma DSH payments are distributed from available funds for FY 2009-2010, WVUH will not have a legal or equitable remedy because the Eleventh Amendment to the United States Constitution prohibits WVUH from suing the Commonwealth for damages. Defendants take the position that no irreparable harm exists because the proposed state plan amendment creates two separate funds, and that there will remain sufficient money left in the Level III fund to pay WVUH any Trauma DSH payment that this court may determine that it is owed. Defendants' introduced evidence at the hearing that this Level III money will not lapse and revert back to the Commonwealth's general fund until at least October 31, 2009 and, if requested by DPW, not until June 30, 2010. (Tr. at 181.) When pressed, however, DPW could not guarantee that it could get approval from the Governor's office to prevent the money from lapsing. (*Id.* at 182-183.) Furthermore, the Commonwealth did not present any evidence of the amount of money that would remain in the Level III fund—after all accredited Level III trauma

---

[13](...continued)
the plan. The court finds the Commonwealth's argument that it is a mere market participant to be unsupported by both the facts of this case, and the operation of the Trauma DSH program.

centers were paid—even if DPW were able to prevent that pot of money from lapsing back into the Commonwealth's general fund.

In light of the absolute bar on damages imposed by the Eleventh Amendment, the Commonwealth's vague assurances that it *might* be able to prevent an unspecified amount of money from lapsing, thus ensuring that there is sufficient money to pay WVUH in the event that this court orders it to do so, is not a bet that this court is willing to take. Accordingly, the court finds that WVUH has demonstrated that absent an injunction it would suffer irreparable harm.

### C.    Harm to the Commonwealth

The third factor for the court to consider before issuing a preliminary injunction is the potential for harm to be caused to the Commonwealth if an injunction were to be issued. The court can see no harm that would be caused to the Commonwealth if this court enjoined it from making any Trauma DSH payments pending final disposition of this case. The Commonwealth would simply be enjoined from upsetting the status quo ante so that the court could examine the constitutionality of its requirement that WVUH obtain PTSF accreditation. While there may be harm to in-state trauma centers from the delay in releasing these funds, this is a separate consideration, and the court can see no harm that would befall Defendants. Contrasted with the potential for irreparable harm to WVUH, the court finds that the equities weigh in favor of an injunction.

### D.    The Public Interest

Once the moving party has established both a likelihood of success on the merits and irreparable harm, the court must balance those factors against whether it is in the public's interest that an injunction be granted. Defendants present a

doomsday scenario whereby hospitals located in Pennsylvania will be closing left and right if they are delayed in receiving Trauma DSH payments. While the court understands that hospitals throughout the Commonwealth are struggling financially, and that the delay in receiving anticipated funding will have an obvious economic impact, the court believes that the broader public interest weighs heavily in favor of granting an injunction. Absent injunctive relief, WVUH could be shut out of receiving any Trauma DSH money from the Commonwealth because the Level I & II money would be distributed, and the Level III money could either be insufficient to meet the Trauma DSH payment to WVUH, could lapse, or both. The purpose of Trauma DSH payments is to compensate those trauma centers that see a disproportionate share of Pennsylvania Medicaid trauma patients. Assuring that WVUH is not being unconstitutionally excluded from receiving these payments is important to the public's interest in a coordinated and cohesive trauma system. Those patients residing in the southwest corner of Pennsylvania rely on access to WVUH and if it is completely deprived of a Trauma DSH payments—as opposed to simply having that payment be delayed—it could very likely harm the trauma services utilized by Pennsylvania Medicaid patients who are taken to WVUH. Accordingly, the court finds that the public interest weighs in favor of granting a preliminary injunction.

### E.      Scope of the Injunction and bond

In accordance with the foregoing discussion, the court finds that WVUH has demonstrated a likelihood of success on the merits of all of its claims, that it would suffer irreparable harm if an injunction were not granted, that Defendants would suffer little to no harm if an injunction were granted, and that the

public interest weighs in favor of granting an injunction. Accordingly, the court finds that a preliminary injunction is appropriate in this case. However, this is not the end of the inquiry as the court must now decide the scope of the injunction, and an appropriate amount of bond to be posted by WVUH.

### i.  Scope of the Injunction

Plaintiff submitted a proposed order along with proposed conclusions of law that would, in effect, have the court enter a final judgment. Although, Federal Rule of Civil Procedure 65(a)(2) expressly permits the consolidation of a preliminary injunction hearing with a trial on the merits, Defendants have not consented to this, and have unequivocally asked the court to permit it to conduct discovery—including retaining an expert—in order to defend this case on its merits. Plaintiff also asks this court to entertain a request for attorneys fees. Although Plaintiff may eventually be entitled to attorneys fees if it prevails on the merits of its case, the court will not entertain such a motion at this stage of the proceedings, and will defer ruling on the appropriateness of fees until a final resolution of the merits of this case.

While Plaintiff overreaches concerning the scope of its requested injunction, Defendants suggest that if the court is inclined to enter an injunction that it should limit the injunctive relief, and allow Defendants to make Trauma DSH payments to Pennsylvania Hospitals which have qualified for such payments, provided that it sets aside enough funding to pay WVUH any Trauma DSH payment which this court ultimately finds it is entitled to receive. While Defendants' suggestion has superficial appeal, the court is concerned that permitting Defendants to make payments to Pennsylvania trauma centers pursuant to the proposed state

plan amendment would be, at a minimum, an implicit blessing of the plan, which is an issue that is hotly contested in this case. The court is wary of putting its imprimatur on the state plan amendment without hearing all of the evidence.

Although the court is mindful of the potential economic impact that a delay in receiving Trauma DSH payments may have on affected Pennsylvania hospitals, WVUH faces the far worse problem of being totally excluded from receiving these payments because of the requirement that it be accredited by PTSF, a requirement that may or may not pass constitutional muster depending on the evidence presented at a trial on the merits of this case. Furthermore, the requirement of PTSF accreditation is inextricably woven into the proposed state plan amendment, such that if the court were to allow it to be partially implemented as to in-state hospitals it may not be able to undo these requirements at a later point if the court were ultimately to decide that this requirement is unconstitutional. Accordingly, the court will enter a preliminary injunction enjoining Defendants from distributing any trauma disproportionate share hospital payments to any hospital pursuant to the Trauma Act or SPA #09-003 until further order of court.

## ii. **Bond**

Federal Rule of Civil Procedure 65(c) states that the court may issue a preliminary injunction only if the movant "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." In the instant case, given that Defendants are all state actors sued in their official capacities, the court believes that a bond of $500.00 is sufficient to meet this criteria.

**IV.**     <u>**Conclusion**</u>

Consistent with the foregoing, the court will grant Plaintiff's motion for a preliminary injunction. Plaintiff has demonstrated a likelihood of success on the merits as to all of its claims, and has demonstrated that it will suffer irreparable harm absent an injunction. Furthermore, there would be little to no harm to Defendants if an injunction is entered, and the public interest favors an injunction because assuring that Plaintiff is not being unconstitutionally excluded from receiving these payments is important to the public's interest in a coordinated and cohesive trauma system. Accordingly, the court will enjoin Defendants from distributing any trauma disproportionate share hospital payments to any hospital pursuant to the Trauma Act or SPA #09-003 until further order of court. An appropriate order will be issued.

s/Sylvia H. Rambo
United States District Judge

Dated: October 2, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WEST VIRGINIA UNIVERSITY HOSPITALS, INC.,** | : | Civil No. 1: CV-09-1684 |
| | : | **JUDGE SYLVIA H. RAMBO** |
| **Plaintiff,** | : | |
| | : | |
| v. | : | |
| | : | |
| **EDWARD G. RENDELL, Governor of the Commonwealth of Pennsylvania, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

# O R D E R

In accordance with the attached memorandum, and for the reasons set forth therein, **IT IS HEREBY ORDERED THAT**:

(1) Plaintiff West Virginia University Hospital's Motion for Preliminary Injunction, (Doc. 5), is **GRANTED**;

(2) Defendants Edward G. Rendell, Estelle B. Richman, and Michael Nardone, and each of their officials, employees, agents and assigns, are hereby **ENJOINED** from distributing trauma disproportionate share hospital ("Trauma DSH") payments to any eligible provider pursuant to the Trauma Systems Stabilization Act, 35 Pa. Cons. Stat. Ann. §§ 6943.1 *et seq*., and Pennsylvania State Plan Amendment #09-003, that part of the Pennsylvania State Plan under Title XIX of the Social Security Act establishing a class of disproportionate share payments to be distributed to hospitals accredited as trauma centers by the Pennsylvania Trauma Systems Foundation, until further order of court;

(3) This order shall take effect as soon as Plaintiff posts a bond of five-hundred dollars and zero cents ($500.00) with the clerk of court for the United States District Court for the Middle District of Pennsylvania, which amount this court deems sufficient to pay the costs and damages sustained by Defendants should they be found to have been wrongfully enjoined or restrained.

**IT IS FURTHER ORDERED THAT** a scheduling conference will be conducted by the court on **Wednesday, October 28, 2009** at **10:30 a.m.** in the chambers of Courtroom No. 3, Eighth Floor, Federal Building, Third and Walnut Streets, Harrisburg, Pennsylvania. **In the interest of economy, the court prefers to hold this conference by telephone. The placement of the telephone conference call is the responsibility of Plaintiff. The telephone number of the court is 717-221-3960.** If the parties prefer to hold this conference in person, the court shall be notified no less than two (2) business days prior to the date above. The primary purpose of this conference will be to establish case management deadlines to enable this action to go forward as efficiently as possible.

Lead counsel shall meet, either in person or by telephone, prior to the case management conference and complete a "Joint Case Management Plan" form. The completed form, which is set forth in Appendix A of the local rules, must be filed by no later than 12:00 p.m. on Friday, October 23, 2009.

s/Sylvia H. Rambo
United States District Judge

Dated: October 2, 2009.

2